UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
PINCUS LAW GROUP, PLLC,

                   Plaintiff,

         v.

MJ CONNECTIONS, INC.,

                   Defendant.
--------------------------------------------------------X

**MEMORANDUM
AND ORDER**
23-CV-5528-SJB-JMW

**BULSARA, United States District Judge:**

This action concerns a creditors' rights law firm that contracted with a legal services company for referrals several years ago. Following a breakdown in their relationship, Pincus Law Group, PLLC ("Pincus") sued MJ Connections, Inc. ("MJC") for breach of their agreement. In response, MJC brought its own counterclaims for breach of contract, attorney's fees, and quantum meruit/unjust enrichment. Pincus has moved for summary judgment on the counterclaims. (Pl.'s Mem. in Supp. of Mot. for Summ. J. dated May 30, 2025 ("Pl.'s Mot."), Dkt. No. 57). Because almost all the counterclaims are untimely under Texas law, which governs the contract, the motion is granted in part and denied in part.

<u>LEGAL STANDARD</u>

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable

jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining whether summary judgment is appropriate, [the Court] must resolve all ambiguities and draw all reasonable inferences against the moving party." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways. Fed. R. Civ. P. 56(c)(1). It may cite to portions of the record "including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials." *Id.* R. 56(c)(1)(A). Alternatively, it may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* R. 56(c)(1)(B); *cf. Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

In moving for summary judgment or answering such a motion, litigants are required by the Local Rules to provide a statement (a Rule 56.1 statement) setting forth purported undisputed facts or, if controverting any fact, responding to each assertion. *See* Loc. Civ. R. 56.1(a)–(b). In both instances, the party must support its position by citing to admissible evidence from the record. *Id.* R. 56.1(d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). "The purpose of Local Rule 56.1 is to

2

streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).

Where claims in opposing Rule 56.1 statements are "genuinely disputed," the Court will consider the evidentiary sources of the claims. *Halberg v. United Behav. Health*, 408 F. Supp. 3d 118, 146 (E.D.N.Y. 2019) (adopting report and recommendation). In evaluating the sources of claims made in dueling Rule 56.1 statements, the Court cannot—as is true for the summary judgment motion as a whole—weigh evidence or assess the credibility of witnesses. *See United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994). "Legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded." *Taveras v. HRV Mgmt., Inc.*, No. 17-CV-5211, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020); *Lawrence v. Cont'l Cas. Co.*, No. 12-CV-412, 2013 WL 4458755, at *1 n.1 (E.D.N.Y. Aug. 16, 2013) ("Both parties have submitted Local Rule 56.1 statements and responses to each other's statements that mix factual assertions with legal argument and therefore fail to meet the requirements of Local Rule 56.1. The facts . . . are taken from those assertions contained in the Local Rule 56.1 statements that comply with Local Rule 56.1[.]" (citations omitted)). The court may not grant summary judgment based on a fact in a Rule 56.1 statement—even if undisputed—not supported by admissible evidence. *E.g.*, *Giannullo v. City of New York*, 322 F.3d 139, 142–43 (2d Cir. 2003) (vacating grant of summary judgment to defendants based on facts enumerated in Rule 56.1 statement supported only by arguments in briefs rather than admissible evidence). The Court must also disregard conclusory denials that lack citations to

3

admissible evidence. *Rodriguez v. Schneider*, No. 95-CV-4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]*"), *aff'd*, 56 F. App'x 27, 29 (2d Cir. 2003). Also, where the opposing party fails to specifically controvert a numbered paragraph in the Rule 56.1 statement, the statement by the moving party "will be deemed to be admitted." Loc. Civ. R. 56.1(c). The Court also does not give any consideration to hearsay, speculation, or inadmissible evidence in evaluating declarations or affidavits. *Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) ("[A] court is obliged not to consider inadmissible evidence at the summary judgment stage[.]"); *Crawford v. Dep't of Investigation*, No. 05-CV-5368, 2007 WL 2850512, at *2 (S.D.N.Y. Oct. 1, 2007) ("[A] non-moving party 'must set forth specific facts showing that there is a genuine issue for trial;' he or she 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.'" (quoting *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005))), *aff'd*, 324 F. App'x 139, 143 (2d Cir. 2009).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Court finds the following facts relevant to its decision—drawn from the pleadings, the parties' respective Rule 56.1 statements, and supporting affidavits and exhibits attached thereto—are undisputed unless otherwise noted. Where a relevant genuine dispute exists, the court highlights both parties' versions of the facts. The Court does not consider portions of the parties' Rule 56.1 statements that are legal

4

conclusions, irrelevant, or merely objections to inferences drawn from the opposing party's statements.[1]

Pincus is a creditors' rights law firm.  (Pl.'s Rule 56.1 Statement dated May 30, 2025 ("Pl.'s 56.1 Stmt."), Dkt. No. 56 ¶ 1; Def.'s Resp. 56.1 Statement dated June 27, 2025 ("Def.'s 56.1 Stmt."), Dkt. No. 58-45 ¶ 1).  MJC is a Texas company headed by Majenica Springer ("Springer"), that provides business development and marketing services to law firms.  (*Id.* ¶¶ 2–3; Pl.'s 56.1 Stmt. ¶¶ 2–3).  On November 28, 2017, Pincus and MJC entered into the MJ Connections Limited Business Development Agreement (the "Agreement").  (*Id.* ¶ 9; Def.'s 56.1 Stmt. ¶ 9; *see also* Agreement, attached to Pl.'s Mot. as Ex. A, Dkt. No. 55-1 at 1).  The Agreement was not set for a fixed term; it was valid "until either party terminat[ed] [the] Agreement by giving sixty (60) days written notice to the other party."  (Agreement at 1).  Under the Agreement, MJC was to "provide business development consulting services to PINCUS" which consisted of "assistance with developing new business, developing and advising the client on a strategic business plan, and assisting with further developing relationships with existing clients." (*Id.*).

---

[1] MJC responds to several facts in Pincus's 56.1 Statement as "undisputed," but then objects to them on some other ground such as the fact's materiality or characterization.  (*E.g.*, Def.'s 56.1 Stmt. ¶ 1).  Such a response is improper under the Local Rules.  In any event, the Court limits the facts here to those that are not opposed in any way, or where opposed, not through admissible evidence which places the fact in actual dispute.

The Agreement included a Remuneration provision requiring Pincus to pay MJC "10% of the amount billed to the Client/Servicer on all new referrals" directed to Pincus by MJC.  (*Id.*).  In the event the Agreement was terminated, Pincus agreed:

> to continue to pay this 10% fee on any monies received in conjunction with business secured by MJ[C] during the contract period *on existing files upon termination* for a period of three (3) years from the termination of the contract.  If PINCUS receives payment for services rendered during those 3 years, after the 3-year period expires, PINCUS will still disburse those monies to MJ[C] within thirty (30) days of receiving said payment.

(*Id.* (the "Tail Fee Provision") (italicized portion added by hand and initialed by parties)).

The Agreement also required that Pincus provide "a monthly accounting of referrals billed to each Servicer and payments received from each Servicer for referrals received in the prior month . . . by the 15th of the following month."  (*Id.*).  Pincus was to "work with MJ[C] to reconcile payments received on referrals secured by MJ[C] on a monthly basis" and MJC would in turn "provide PINCUS with an invoice . . . payable within (30) days of PINCUS's receipt of each invoice."  (*Id.*).  The Agreement is "governed by and construed under the laws of the State of Texas governing contracts made and to be performed in that state."  (Agreement at 3).

The parties ultimately discontinued their relationship on December 18, 2019. (Pl.'s 56.1 Stmt. ¶ 56; Def.'s 56.1 Stmt. ¶ 56).  The parties had no further contact until February 1, 2023 when MJC demanded a financial reconciliation from Pincus pursuant to the Agreement's Tail Fee Provision.  (*Id.* ¶ 58; Pl.'s 56.1 Stmt. ¶ 58).

Pincus commenced this action on June 14, 2023 in the Supreme Court of New York, Nassau County against MJC and Springer.[2]  (Notice of Removal dated July 20, 2023, Dkt. No. 1 at 1; *see also* Compl., attached to Notice of Removal as Ex. B, Dkt. No. 1-2).  MJC and Springer removed the case to federal court on July 20, 2023.  (Notice of Removal at 5).

Pincus filed an amended complaint on January 26, 2024.  (Am. Compl., Dkt. No. 21).  The Amended Complaint asserted a variety of breaches arising out of MJC's alleged prohibited interactions with clients listed in the Agreement.  (*Id.* ¶¶ 57–66).[3]

On February 16, 2024, MJC filed an Answer and asserted three counterclaims: (1) breach of contract—failure to provide accounting, (MJC's Answer & Countercls. ("MJC Countercls."), Dkt. No. 22 ¶¶ 99–106); (2) breach of contract—failure to make payments, (*id.* ¶¶ 107–13); and (3) attorney's fees under Texas law, (*id.* ¶¶ 114–25).

Both parties were granted leave to file amended answers.  (Orders dated Mar. 6, 2025).  In its Amended Answer filed on March 13, 2025, MJC added a fourth counterclaim: quantum meruit and/or unjust enrichment.  (MJC's Am. Answer & Countercls. ("MJC Am. Countercls."), Dkt. No. 45 ¶¶ 134–47).  MJC alleges that it provided valuable consulting, marketing, and business development services to Pincus from the inception of the Agreement through its termination on December 18, 2019.  (*Id.* ¶ 140).  MJC provided those services with the expectation that it would be

---

[2] Springer was later terminated after the Amended Complaint omitted her as a defendant.  (*See* Am. Compl. filed Jan. 26, 2024, Dkt. No. 21).

[3] Pincus omitted a claim for breach of the covenant of good faith and fair dealing it had previously asserted in its state court complaint.  (Compl. ¶¶ 48–54).

compensated, as evidenced by the Agreement.  (*Id.* ¶ 141).  Pincus requested and benefited from these services but failed to compensate MJC for them.  (*Id.* ¶¶ 142–43).  As such, MJC claims it is entitled to recover the reasonable value of its services provided to Pincus in quasi-contract under quantum meruit and/or unjust enrichment.  (*Id.* ¶ 147).

DISCUSSION

## I.    Breach-of-Contract Counterclaims

MJC raises two breach-of-contract counterclaims against Pincus for (1) failure to make contractually agreed to payments and (2) failure to provide contractually agreed to accounting.[4]  (MJC Am. Countercls. ¶¶ 108–22).

### A.  Choice of Law

"As a general matter in diversity cases," like the present lawsuit, the Court will "follow the substantive law of the state in which the district court sits, including its choice of law rules."  *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 607 (2d Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  That is, "in cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state, which is New York in this instance."  *Bigio v. Coca–Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012).

---

[4] A breach of contract claim requires proof of four elements: "(1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach."  *Houle v. Casillas*, 594 S.W.3d 524, 556 (Tex. App. 2019).

8

Subject to certain exceptions, New York choice-of-law rules honor parties' decisions to choose one jurisdiction's law to govern a contract. *Freedman v. Chem. Const. Corp.*, 43 N.Y.2d 260, 265 n.* (1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored. It is as though the law of the selected jurisdiction were incorporated into the agreement by reference." (citations omitted)); *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994) (recognizing and following *Freedman*). And "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).

Here, the parties' Agreement stipulates that Texas law shall govern. (Agreement at 3 ("This Agreement shall be governed by and construed under the laws of the State of Texas governing contracts made and to be performed in that state.")). And neither side suggests application of the choice-of-law provision violates New York public policy or constitutes fraud. Therefore, the Court applies Texas law to the two counterclaims alleging breach of the Agreement. *See, e.g.*, *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 472 (2d Cir. 2022) ("Th[e] general rule [that New York courts enforce choice-of-law clauses] applies even to issues of contract validity and the parties' ability to execute the agreement containing the choice-of-law clause.").

**B. Statute of Limitations**

Under Texas law, "the party asserting that a claim is barred by the statute of limitations bears the burden of proof on this issue." *Capital One, N.A. v. Custom Lighting & Elec., Inc.,* No. 09-CV-3614, 2010 WL 4923470, at *3 (S.D. Tex. Nov. 29, 2010) (citing *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999)). A party seeking summary judgment on a limitations defense must establish: "(1) when the cause of action accrued, and (2) that the [non-movant] brought its suit later than the applicable number of years thereafter—i.e., that the statute of limitations has run." *Draughon v. Johnson*, 631 S.W.3d 81, 89 (Tex. 2021) (quotations omitted).[5]

"Under Texas law, a breach-of-contract claim is subject to a four-year statute of limitations." *Sheet Pile, LLC v. Plymouth Tube Co., USA*, 98 F.4th 161, 166 (5th Cir. 2024) (citing Tex. Civ. Prac. & Rem. Code § 16.051). A cause of action accrues when "facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). If the terms of an agreement call for periodic payments, a separate cause of action for each payment accrues at each interval for which payment is due. *Lyle v. Jane Guinn Revocable Tr.*, 365 S.W.3d 341, 355 (Tex. App. 2010). This is generally a question of law, not fact. *Provident Life & Accident Ins. Co.*, 128 S.W.3d at 221. "It is well-settled law that a breach of contract claim accrues when the contract is breached." *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002).

---

[5] The non-movant can avoid summary judgment by "raising a genuine issue of material fact on any equitable defense that its suit should not be barred even though the limitations period has run." *Draughon*, 631 S.W.3d at 89. MJC has not raised such a defense.

There are two breach-of-contract counterclaims: one alleging failure to make payments under the Agreement, and the second failure to provide the accounting required by the Agreement.

As for the failure to make payments, MJC alleges that Pincus began to fall behind on its payments in early 2019, (*see* MJC Am. Countercls. ¶ 100; *see also* Decl. of Majenica Lynn Springer ("Springer Decl."), Dkt. No. 58-43 ¶ 36), and also alleges a breach for the failure to provide the Tail Fee demanded on February 1, 2023, (*see* MJC Am. Countercls. ¶¶ 105, 120).  MJC first alleged breach on February 16, 2024.  (*See* MJC Countercls. ¶¶ 107–13).  Therefore, recovery for payments more than four years overdue—i.e., payments due on or before February 16, 2020—is barred by the limitations period.  *See, e.g.*, *Hollander v. Capon*, 853 S.W.2d 723, 726–28 (Tex. App. 1993).  However, to the extent MJC claims breach for failure to make payments due after February 2020—namely the Tail Fee payments—those claims are not barred by the statute of limitations and Pincus's motion for summary judgment on those claims is denied.

As to the failure to provide accounting, MJC does not allege specific dates for this breach in its Counterclaim, other than to say that it requested a final accounting on February 1, 2023, related to the Tail Fee payments.  (MJC Am. Countercls. ¶ 105).  The parties do not dispute that as early as July 17, 2019, Pincus was several months behind in providing the monthly accountings under the Agreement.  (Pl.'s 56.1 Stmt. ¶ 40; Def.'s 56.1 Stmt. ¶ 40).  Additionally, MJC does not contest that the parties ended their relationship on December 18, 2019.  (*Id.* ¶ 56 ("It is undisputed that the parties' relationship ended on December 18, 2019.  Disputed to the extent that the

11

discontinuance of the parties' relationship constituted a termination of the Agreement.")).  MJC does not allege a failure to provide interim accountings between the date of termination and its demand for a final accounting.  Except for the final accounting demand, the last day an accounting claim could have been asserted is December 18, 2023, four years after the last possible breach.  Consequently, except for the final accounting demand, which was made on February 1, 2023, (Pl.'s 56.1 Stmt. ¶ 58; Def.'s 56.1 Resp. Stmt. ¶ 58), all other accounting claims are barred because MJC did not assert breach until February 16, 2024.  (*See* MJC Countercls. ¶¶ 99–106); *e.g.*, *Cont'l Cas. Co. v. Dr. Pepper Bottling Co. of Tex., Inc.*, 416 F. Supp. 2d 497, 504 (N.D. Tex. 2006) (granting summary judgment where "there [were] no genuine material fact issues pertaining to the running of the statute of limitations").

The Court, therefore, turns to Pincus's other two arguments to determine whether either would lead to dismissal of the Tail Fee breach counterclaim or the counterclaim for failure to conduct the final accounting demanded in February 2023. As discussed below, there are issues of fact.

## C.  Abandonment and Unenforceability

Pincus raises two arguments for why the counterclaims for breach should be dismissed: (1) the parties abandoned the Agreement; and (2) the Agreement is unenforceable because it contemplates payment for client referrals, which is prohibited under Texas law.  Pincus appears not to recognize the boomerang effect of these arguments: if true, they would disable its affirmative claims for breach of the Agreement.  (In reverse, MJC, which did not move for summary judgment, appears not

12

to recognize that the statute of limitations bar would apply equally to Pincus.).  There are issues of fact about both abandonment and unenforceability.  Nonetheless, Pincus appears to be engaging in pyrrhic warfare that will lead only to mutually-assured-destruction: a trial where its arguments invalidating the Agreement apply with equal measure to claims and counterclaims, leaving both sides with no recovery and a pile of legal fees.[6]

### 1. Abandonment

Under Texas law, abandonment of a contract "must be established by clear and satisfactory evidence" and any conduct relied upon must be "positive, unequivocal and inconsistent with the existence of the contract."  *Dall./Ft. Wor. Int'l Airport Bd. v. INet Airports Sys., Inc.*, 819 F.3d 245, 255 (5th Cir. 2016) (quotations omitted).  Pincus asserts that the parties mutually abandoned the Agreement after Pincus asked MJC to modify the Agreement's financial terms to switch to a monthly billing arrangement: "Are you open to converting our contractual structure to mirror to that of your other firms?" (Pl.'s Mot. at 11 (citing July 2019 Emails, attached to Pl.'s Mot. as Ex. S, Dkt. No. 55-19 at 2541)).  MJC responded: "I'm sure we can figure something out."  (July 2019 Emails at 2541).  Pincus assumes that the parties' professed intention to renegotiate demonstrates an unequivocal intent to abandon the Agreement.  But it cites no evidence for that position, and MJC points to evidence suggesting the renegotiation was the opposite of abandonment: Springer testifying that the parties understood the transition to a

---

[6] Nor does Pincus appear to realize that prevailing on the unenforceability argument would mean that it entered into an agreement—and paid monies pursuant to that contract—in violation of Texas disciplinary rules.

monthly fee was a "band-aid" to ensure some revenue "in order to continue working." (Springer Decl. ¶ 44).

Pincus argues that the parties then actually abandoned the Agreement by entering into a "New Monthly Marketing Fee," citing to invoices reflecting a flat $ 5000 consulting fee for the months of August to December 2019.  (Pl.'s Mot. at 12; *e.g.*, Invoice due 10/12/2019, attached to Pl.'s Mot. as Ex. X, Dkt. No. 55-24 at 952).  But MJC contends that the adjusted fee did not itself constitute a new agreement: the monies were payments owed under the existing Agreement.  (Def.'s 56.1 Stmt. ¶ 43 (citing Aug. 13, 2019 Springer Email, attached to Def.'s Mem. in Opp'n to Pl.'s Mot. as Ex. 14, Dkt. No. 58-14 ("I would like to have another discussion with you about our structure going forward.  I went ahead and sent this month's invoice with a $5,000/mo. Consulting Rate.")); *see also* Aug. 29, 2019 Pincus Email, attached to Def.'s Opp'n as Ex. 37, Dkt. No. 58-36 ("Sending you another $5K today so that we don't add to the monthly aging meanwhile we're waiting to discuss.")).  Relatedly, though the parties do not dispute that MJC circulated a revised contract with a monthly marketing fee on October 18, 2019, the agreement was never signed, (Pl.'s 56.1 Stmt. ¶¶ 51–52; Def.'s 56.1 Stmt. ¶¶ 51–52).  The fact that a proposed agreement was circulated does not in itself prove an abandonment of the original Agreement. [7]

---

[7] Pincus also itself shifts the date of abandonment, asserting that the claims were abandoned in August 2019 in the 56.1 Statement, (Pl.'s 56.1 Stmt. ¶ 59), but Pincus testified that the date was September 2019, (Dep. of Caryn Pincus, attached to Def.'s Opp'n as Ex. 36, Dkt. No. 58-35 at 40:20–41:14).

Given these disputes and contradictions, the Court is unable to determine whether the parties unequivocally intended to abandon the Agreement as a matter of law.

### 2. Unenforceability

Under Texas law, the "sharing of fees with a layman by a lawyer is prohibited by statute, as well as by disciplinary rule." *Plumlee v. Paddock*, 832 S.W.2d 757, 759 (Tex. App. 1992) (citing Tex. R. Prof. Cond. 5.04(a)). "A lawyer may pay others for generating client leads, such as Internet-based client leads, as long as the lead generator does not recommend the lawyer, any payment to the lead generator is consistent with Rule 5.04(a)," Tex. R. Prof. Cond. 7.03 cmt. 13, but "[a] lawyer shall not . . . pay or give anything of value to a person not licensed to practice law for soliciting or referring prospective clients for professional employment." Tex. R. Prof. Cond. 7.03(e). And a court may consider the Rules of Professional Conduct as an expression of Texas public policy, which renders a contract violating them unenforceable. *See Plumlee*, 832 S.W.2d at 758–59. Pincus argues that because the Agreement tied MJC's compensation to the legal fees that Pincus received, the Agreement is an impermissible legal-referral fee contract. (Pl.'s Mem. in Further Supp. of its Mot. ("Pl.'s Reply"), Dkt. No. 60 at 3–4).

There is a material issue of fact in dispute about this question. Rule 7.03 provides an exception for attorneys paying "reasonable fees for advertising and public relations services or the usual charges of a lawyer referral service that meets the requirements of Texas law." Tex. R. Prof. Cond. 7.03(e)(1); *see also id.* cmt. 11 ("A lawyer may compensate . . . agents, and vendors who are engaged to provide marketing or

15

client development services, such as . . . business-development staff.")  Here, the Agreement compensated MJC for its service in "provid[ing] advice, assistance and consultation with respect to business development needs."  (Agreement at 1).

MJC contends the services it provided under the Agreement did not constitute the solicitation or referral of clients, but rather marketing services.  (Def.'s Mem. in Opp'n to Pl.'s Mot. dated June 27, 2025 ("Def.'s Opp'n"), Dkt. No. 58-46 at 6).  And it supplies evidence in support of this position.  In her deposition, Springer testified that she generally provides "marketing" services in the mortgage space.  (Dep. of Majenica Springer ("Springer Dep."), attached to Pl.'s Mot. as Ex. B, Dkt. No. 55-2 at 36:5-17; *see also* Springer Decl. ¶ 29 ("MJC markets its network law firms' legal services to various mortgage servicers; assists these law firms by creating introductions and arranging face-to-face meetings with potential mortgage servicer clients; and assists these law firms regarding how to demonstrate to the mortgage servicers that they will be able to provide legal services meeting industry standards.")).  And these were the services provided to Pincus under the Agreement.  (Springer Decl. ¶ 33).  This evidence is sufficient to establish an issue of fact as to the nature of the work required and performed by MJC under the Agreement and whether that work constituted impermissible fee sharing under Texas law.[8]

---

[8] Pincus also argues that the referral provision is impermissible under Texas Rule of Professional Conduct 1.04(f)(2), which prohibits sharing legal fees between lawyers who are not in the same firm.  (Pl.'s Mot. at 8).  Pincus, citing to no authority, assumes this provision automatically bars fee sharing with another lawyer in Texas.  But even if Rule 1.04(f) applies, there remains the threshold issue of whether the parties expected Springer to provide legal services pursuant to the Agreement and whether monies paid were actually legal fees.

II.     **Quasi-Contract Counterclaim**

MJC's quasi-contract counterclaim alleges "quantum meruit and/or unjust enrichment."[9] (MJC's Am. Countercls. ¶¶ 134–47). For the same reasons—namely the statute of limitations—the claim is dismissed. (MJC does not allege accounting failures in this counterclaim, just a failure to provide compensation.) (*See id.*).

**A. Choice of Law**

As noted, this Court is obligated to apply New York's conflict-of-law rules, *supra* pp. 8–9, which generally require following parties' contractual choice-of-law election. It appears that no New York court has authoritatively decided whether that election also determines the law to be applied to quasi-contract (non-tort) claims.[10] Although there appears to be a split of authority, *see 2002 Lawrence R. Buchalter Alaska Tr. v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 233–34 (S.D.N.Y. 2015) (collecting cases), this Court opts to follow those cases using the same law for contract and quasi-contract claims alike and not conducting a new conflict-of-law analysis (as MJC urges, in order to have

---

[9] MJC does nothing to explain the difference between its use of the two terms, which typically affects the measure of damages. *Paffhausen v. Balano*, 708 A.2d 269, 271 (Me. 1998) ("Damages in unjust enrichment are measured by the value of what was inequitably retained. In *quantum meruit,* by contrast, the damages are not measured by the benefit realized and retained by the defendant, but rather are based on the value of the services provided by the plaintiff." (citation omitted)).

[10] If these were tort claims, a different analysis would apply. *Fin. One Pub. Co. v. Lehman Bros. Special Fin. Inc.*, 414 F.3d 325, 335 (2d Cir. 2005) ("Under New York law, then, tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause."); *Klock v. Lehman Bros. Kuhn Loeb Inc.*, 584 F. Supp. 210, 215 (S.D.N.Y. 1984) ("[I]t has been held in New York that a contractual choice of law provision governs only a cause of action sounding in contract.").

17

New York law apply, (Def.'s Opp'n at 9–11)).  *E.g.*, *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 381 (S.D.N.Y. 2006) ("[T]he Court finds that New York law, not California law, governs B & O's contract claims arising from the Retainer Agreement, *viz.*, its claim for breach of the Retainer Agreement and its claims for damages under quantum meruit and unjust enrichment."); *cf. Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1255 (N.D. Cal. 2019) (applying agreement's election of Texas law to both contract and unjust enrichment claims).  To do otherwise would permit a party to ignore the bargained for provisions of an agreement, by simply reframing their contract claim as a quasi-contractual allegation.[11]  Notably, in those cases where different law has been applied, the quasi-contract claim alleged "extra-contractual" obligations.  *Tropical Sails Corp. v. Yext, Inc.*, No. 14-CV-7582, 2017 WL 1048086, at *12 (S.D.N.Y. Mar. 17, 2017) ("If anything can be gleaned from the conflicting case law . . . , it is that the more an unjust enrichment claim relates to an enforceable contract, the more likely it is to be considered contractual in nature for the purposes of New York's choice-of-law analysis.").

But here, the quasi-contract claims arise out of the same conduct governed by the Agreement.  (*See, e.g.*, MJC Am. Countercls. ¶¶ 140–41 ("MJC provided valuable consulting, marketing and business development services to Pincus Law from the

---

[11] Doctrines that preclude pleading quasi-contract claims when there is an enforceable agreement may dull the impact of such an effort, and that may explain the dearth of cases analyzing the conflict-of-law question.  And while Pincus does allege that the counterclaim is duplicative of the breach-of-contract counterclaim, (Pl.'s Mot. at 15), it is premature to dismiss on that ground, because Pincus contends that the Agreement is unenforceable.  And as noted, enforceability cannot be decided at summary judgment.

inception of the Agreement through its termination by Pincus Law on December 18, 2019.  MJC provided these services with the reasonable expectation that it would be compensated for the services provided, as evidenced by the Agreement."); *id.* ¶ 145 ("Pincus Law has been unjustly enriched at the expense of MJC by retaining the benefit of MJC's services without providing the agreed upon compensation.")).  As such, the Court applies Texas law to the unjust enrichment/quantum meruit counterclaim.  *E.g.*, *Tropical Sails Corp.*, 2017 WL 1048086, at *13 ("The Court . . . applies [the] contractual choice-of-law provision's selection of New York law to the unjust enrichment claim here, because the unjust enrichment claim arises from the payment conferred on Yext for its PowerListings service, which sounds more in contract than in tort.").[12]

---

[12] The same result—the application of Texas law—would result even if the choice-of-law provision in the Agreement did not control, and the Court simply applied New York's conflict-of-law principles.  Under those New York rules, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) (citing N.Y. C.P.L.R. 202).  Here, MJC is the nonresident "plaintiff" bringing the quasi-contract counterclaim, and this cause of action accrued in Texas which is where MJC is located and sustained the economic loss.  *Id.* at 498 ("Where the injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." (quotations omitted)); *Elavon, Inc. v. Katz*, No. 23-1259, 2025 WL 1202075, at *3 (2d Cir. Apr. 25, 2025) ("The New York Court of Appeals has explained that, under New York law, the place of a purely economic injury to a corporation is typically limited to two options: the corporation's principal place of business or its state of incorporation.").  And although New York provides for a longer statute of limitations for unjust enrichment and quantum meruit (six years), *Nwoye v. Obama*, No. 23-1178, 2024 WL 911753, at *1 (2d Cir. Mar. 4, 2024), compared to Texas (two or four years respectively), N.Y. C.P.L.R. 202 requires the application of the Texas rule which has the shorter limitations period.

## B.  Statute of Limitations

Under Texas law, unjust enrichment claims are governed by a two-year statute of limitations.  *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007) (citing Tex. Civ. Prac. & Rem. Code § 16.003).  Quantum meruit claims are governed by a four-year statute of limitations.  *Quigley v. Bennett*, 256 S.W.3d 356, 361 (Tex. App. 2008).

An unjust enrichment claim accrues "when facts come into existence that authorize a claimant to seek a judicial remedy."  *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 410 (5th Cir. 2004) (quoting *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998)).  Here, MJC's claim for unjust enrichment is rooted in the services it provided from the inception of the Agreement to its termination on December 18, 2019.  (*See* MJC Am. Countercls. ¶ 140).  Therefore, the latest date of accrual is the date of termination of the Agreement, when MJC asserts it ceased providing its services, (Springer Decl. ¶ 59).  As such, any unjust enrichment claim accrued on December 18, 2019, making the deadline to bring this claim December 18, 2021 — well before MJC asserted its quasi-contract counterclaim on March 13, 2025.

Similarly, a claim for quantum meruit accrues when the services are performed.  *See Quigley*, 256 S.W.3d at 361; *see also W. Power, Inc. v. TransAmerican Power Prod., Inc.*, 316 F. Supp. 3d 979, 987 (S.D. Tex. 2018) ("A claim of quantum meruit accrues on the date the defendant accepts the services at issue.  But, [w]hen a provider is to be paid multiple times as services are provided, a quantum meruit claim accrues when the services are performed." (quotations and citations omitted)).  MJC ceased providing

20

services on December 18, 2019, (*see* MJC Am. Countercls. ¶ 140), making the statute of limitations deadline December 18, 2023.  Again, given that MJC did not assert the claim until March 13, 2025, it is similarly time-barred.[13]  The Court, therefore, grants Pincus's motion for summary judgment as to dismissal of the quasi-contract counterclaim.[14]

## III.    Counterclaim for Attorney's Fees

Pincus also moves for summary judgment on MJC's counterclaim for attorney's fees under Texas law.  Under Texas law, the successful party in a contract dispute may recover reasonable attorney's fees.  Tex. Civ. Prac. & Rem. Code § 38.001(b)(8).  But such a claim may only be brought by a prevailing party.  *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).  As noted, at least a portion of two counterclaims survive, which leaves open the possibility for attorney's fees recovery.  Therefore, the motion for summary judgment on this counterclaim is denied.

CONCLUSION

For the reasons explained above, Pincus's motion for summary judgment is granted in part and denied in part.  Pincus's motion is granted as to MJC's breach-of-contract counterclaim for failure to make payments to the extent MJC claims any payment due on or before February 16, 2020.  Pincus's motion as to any claim for

---

[13] The Tail Fee obligation is one arising out of the Agreement, not services rendered.  In any event, to the extent the Court were to consider the Tail Fee request an obligation for services rendered—if it were to be framed as a quasi-contractual obligation—it would have to have been asserted by December 2023 (as a quantum meruit claim) or February 2025 (as an unjust enrichment claim), but here it was alleged as a counterclaim in March 2025.

[14] MJC did not make any relation-back argument in its opposition to summary judgment.

21

payment due after this date is denied.  Pincus's motion is granted as to MJC's breach-of-contract counterclaim for failure to provide accounting, except for the final accounting demand made on February 1, 2023.  The Court also grants Pincus's motion as to dismissal of MJC's quasi-contract counterclaim as time-barred.  Given the survival of portions of the breach-of-contract counterclaims, Pincus's motion for summary judgment as to the attorney's fees counterclaim is denied.[15]  The parties are directed to submit a joint proposed pretrial order by **March 30, 2026**, consistent with the undersigned's Individual Practices.

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:   February 26, 2026
         Central Islip, New York

---

[15] Pincus seeks, in the guise of an "even if" argument, summary judgment on its affirmative claims.  (*See* Pl.'s Mot. at 17–19).  But that motion assumes that the Agreement is enforceable—about which there remains an issue of fact.  (There is also the related question of whether the statute of limitations bar would rebound to bar these claims.)  Since the issue of enforceability will proceed to trial, and the Court does not issue hypothetical rulings, Pincus's motion on its claims is denied.